IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:08-CV-455-D

| | | |
|---|---|---|
| JEROY FAIRCLOTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Jeroy Faircloth, Jr. ("plaintiff") challenges the final decision of defendant Commissioner of Social Security ("Commissioner") denying his application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") on the grounds that he is not disabled.[1] The case is before the court on the parties' respective motions for judgment on the pleadings (D.E. 17, 21). The motions were referred to the undersigned Magistrate Judge for memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* D.E. 26). For the reasons set forth below, it will be recommended that the Commissioner's motion be allowed, plaintiff's motion be denied, and the final decision of the Commissioner be affirmed.

## I. BACKGROUND

### A.     Case History

Plaintiff protectively filed applications for DIB and SSI on 31 March 2006, alleging a disability onset date of 23 March 2006 due to "Sugar and Sleep Disorder." Transcript of Proceedings

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same. The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416.

("Tr.") 112, 127.[2] The applications were denied initially on 11 May 2006 and on reconsideration on 3 October 2006, and a request for hearing was timely filed on 18 October 2006. *Id.* 65, 74, 79, 90. On 23 January 2008, a hearing was held before an Administrative Law Judge ("ALJ"). *Id.* 24, 39.

In a written decision dated 19 March 2008, the ALJ found that plaintiff was not disabled and therefore not entitled to DIB or SSI. *Id.* 11-18. Plaintiff's timely request for review by the Appeals Council was denied on 20 August 2008. *Id.* 1. Plaintiff then commenced this proceeding for judicial review on 11 September 2008 pursuant to 42 U.S.C. § 405(g). *See* Compl. (D.E. 4).

## B.     Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The Act goes on to describe more specifically the requisite effect of any impairments:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B).

The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

---

[2] Citations are to the transcript page numbers inserted by the Commissioner, rather than the page numbers imprinted by the court's CM/ECF electronic filing system.

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The burden of proving disability falls upon the claimant. *English v. Shalala,* 10 F.3d 1080, 1082

(4th Cir. 1993).

The disability regulations under the Act ("Regulations") provide the following five-step

analysis that the ALJ must follow when determining whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R. § 404.1509 for DIB and *id.* § 416.909 for SSI], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] . . . and meets the duration requirement, we will find that you are disabled. . . .

> (iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the

analysis. *Pass,* 65 F.3d at 1203. The burden shifts to the Commissioner at the fifth step to show that

alternative work is available for the claimant in the national economy. *Id.*

3

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

C. **Findings of the ALJ**

Plaintiff was 59 years old on the alleged onset date of disability and was 60 years old on the date of the administrative hearing. *See, e.g.*, Tr. 206 (stating plaintiff's birth date). Plaintiff's past work experience included work in a janitorial position at Impulse, Inc. ("Impulse") in Mt. Olive, North Carolina. *See, e.g., id.* 133, 157, 158.

Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. *Id.* 13 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairments which were severe within the meaning of the Regulations, 20 C.F.R. §§ 404.1520(c), 416.920(c): diabetes mellitus, obesity, hypertension, sleep apnea, right carpal tunnel syndrome, median neuropathy, and degenerative arthritis of the right knee. *Id.* 13 ¶ 3. At step three, the ALJ found that plaintiff did not have any impairments that met or medically equaled, singly or in combination, one of the impairments listed in Appendix 1 to 20 C.F.R. pt. 404, subpt. P. *Id.* 13 ¶ 4.

The ALJ then determined that plaintiff had the RFC to perform a wide range of light work. *Id.* 17. More specifically, the ALJ found plaintiff had the RFC to: lift and carry 20 pounds occasionally, and 10 pounds frequently; push and pull 20 pounds occasionally and 10 pounds

4

frequently; and stand and walk up to 6 hours in an 8-hour workday and sit up to 6 hours in an 8-hour workday. *Id.* 14 ¶ 5. The RFC also limited plaintiff to only frequent right-hand tasks requiring fingering and handling, and no work requiring driving a motor vehicle. *Id.*

At step four, the ALJ found that plaintiff's work at Impulse constituted past relevant work and that plaintiff's RFC enabled him to perform that work. *See id.* 17 ¶ 6. In making this finding, the ALJ accepted the testimony of a vocational expert that plaintiff's job at Impulse fit the classification of industrial cleaner under the *Dictionary of Occupational Titles* ("*DOT*") (#381.687-018), although at the light exertional level as plaintiff performed it. *Id.* 17-18. The ALJ accordingly found plaintiff not disabled and did not reach step five of the analysis. *Id.* 18 ¶ 7.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401.

5

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

**B.     Overview of Plaintiff's Contentions**

Plaintiff contends that the ALJ's decision should be reversed because the ALJ erred by: (1) not considering all of plaintiff's impairments, (2) not including all of plaintiff's limitations in the RFC determination, and (3) finding plaintiff to have had past relevant work. Each of these contentions is examined in turn below.

**C.     Consideration of All Impairments**

**1.     Neuropathy**

Plaintiff contends that the ALJ failed to consider fully the neuropathy in plaintiff's arms and hands (*i.e.*, upper extremities), apparently including polyneuropathy in his right arm and hand, and

6

peripheral neuropathy in both his arms and hands.[3] Neuropathy can be defined as an abnormal state of the nerves; polyneuropathy as a disease of the nerves; and peripheral neuropathy as a disease or degenerative state of the peripheral nerves (*i.e.*, those outside the central nervous system) characterized by muscle weakness and atrophy, pain, and numbness. *See* "neuropathy," "polyneuropathy," "peripheral neuropathy," and "peripheral nervous system," *MedlinePlus Medical Dictionary*, www.nlm.nih.gov/medlineplus/mplusdictionary/html (U.S. Nat'l Med. Library & Nat'l Inst. of Health) (hereafter "*MedlinePlus Dictionary*").[4] According to plaintiff, the ALJ should have found the peripheral neuropathy in both arms and hand, not simply the right carpal tunnel syndrome/ median neuropathy,[5] to be a severe impairment. The court disagrees with plaintiff's contentions.

Review of the ALJ's decision shows that he did consider fully the neuropathy in plaintiff's arms and hands. The ALJ's full consideration of neuropathy is evidenced, in part, by his discussion of the principal treatment records relating to it.

As the ALJ states, plaintiff was first diagnosed with a neuropathy, specifically, peripheral neuropathy, in a 31 March 2006 visit to Joseph Okoye, M.D., who appears to have served as plaintiff's primary-care physician from that month until October 2007. Tr. 15, 185. Plaintiff had complained in a visit to Dr. Okoye two days earlier of numbness of the fingertips on his right hand. *Id.* 186. In the next neuropathy-related visit some nine months later, in December 2006, plaintiff complained to Dr. Okoye of pain, numbness, and weakness of "bilateral" forearm and hand. *Id.* 16,

---

[3] Although the short but imprecise section of plaintiff's memorandum presenting this argument addresses both polyneuropathy and peripheral neuropathy, it is titled only "Polyneuropathy." (Plf.'s Mem. (D.E. 18) at 3-4).

[4] Copies of all internet materials cited herein are attached as an appendix for purposes of preservation of the record in this case.

[5] The medical records use the terms "median neuropathy" and "carpal tunnel syndrome" synonymously. *See* Tr. 227 (note of 30 Jan. 2007 visit to Dr. Okoye), 234 (report on nerve conduction studies).

7

230. Dr. Okoye again found plaintiff to have peripheral neuropathy in both his arms and hands, and

ordered electromyography ("EMG")[6] and nerve conduction studies on the right arm and hand. *Id.*

230. The ALJ then notes that the studies found plaintiff to have "severe right median neuropathy

at the wrist—carpal tunnel syndrome," as well as sensory arousal polyneuropathy consistent with

plaintiff's history of diabetes. *Id.* 16; *see also id.* 234. As the ALJ states, in a follow-up visit with

Dr. Okoye in January 2007, plaintiff continued to have pain and numbness in both hands, especially

the right one, and opted for conservative management with wrist splints and Ibuprofen. *Id.* 16, 227.

The ALJ then recites that at the next visit with Dr. Okoye, in March 2007, plaintiff had no

complaints and was tolerating his medication well. *Id.* 16, 17, 225.

There followed a series of five visits by plaintiff to Dr. Okoye in which plaintiff voiced no

complaints about his arms and hands, and which the ALJ understandably does not discuss in

connection with the condition of plaintiff's arms and hands. *See id.* 211, 216, 221, 222, 223. The

ALJ does note that at an office visit by plaintiff on 31 December 2007, G. David Dyer, M.D., who

had apparently taken over as plaintiff's primary-care physician the preceding month, found plaintiff

to have full range of motion of his extremities without pain. *Id.* 17, 201. This visit was the last in

the period covered by plaintiff's medical records—March 2006 to December 2007.

In addition to reviewing plaintiff's treatment records, the ALJ references in his decision the

finding in the evaluation by examining consultative physician Nikki Daskalakis, M.D. and two RFC

assessments by nonexamining state agency consultants that plaintiff did not have manipulative

limitations. *Id.* 15, 163, 172, 196. *See* 20 C.F.R. §§ 404.1527(f), 416.927(f) (evaluation of

---

[6] Electromyography refers to the testing of the electrical activity associated with a functioning muscle for the diagnosis of neuromuscular disorders and other purposes. *See* "electromyograph," *MedlinePlus Dictionary.*

8

assessments of nonexamining state agency consultants). The ALJ also notes plaintiff's hearing testimony that he experienced pain in both his hands, and goes on to make an express determination regarding the credibility of this and other testimony by plaintiff regarding his impairments.[7] *Id.* 15, 16-17.

Moreover, the ALJ makes an express finding in step three of the analysis that addresses the neuropathy in both of plaintiff's arms and hands. Specifically, he finds that plaintiff's neuropathy is not "demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dextrous movements," as required to meet listing 9.08. *Id.* 14. The ALJ also, of course, includes in his RFC determination the limitation that plaintiff engage in only frequent right-hand tasks requiring fingering and handling. *Id.* ¶ 5. Thus, contrary to plaintiff's contention, the ALJ did fully address the neuropathy in plaintiff's arms and hands in his decision.

To the extent that plaintiff is contending that the ALJ erred by not treating plaintiff's right-hand polyneuropathy and his peripheral neuropathy as distinct impairments, the argument also fails. The ALJ's handling of plaintiff's neuropathy is consistent with that reflected in the medical records. As the foregoing review of the records indicates, the finding of sensory arousal polyneuropathy appears only in the report on the nerve conduction studies on plaintiff's right arm and hand. *Id.* 234. Dr. Okoye did not make a formal diagnosis of sensory arousal polyneuropathy based on the studies. *See id.* 227. Similarly, the diagnosis of peripheral neuropathy appears in the treatment notes twice, those of 31 March 2006 and December 2006 visits with Dr. Okoye. *Id.* 185, 230. Thus, the

---

[7] As discussed further below, the ALJ found plaintiff's testimony on the severity of his impairments to be less than fully credible. Tr. 16-17.

9

treatment notes most frequently address plaintiff's neuropathy without the distinctions plaintiff posits. Aside from the findings in the nerve conduction studies, the polyneuropathy is not uniquely associated with particular symptoms, limitations, or treatments. Similarly, the medical records do not uniquely tie the peripheral neuropathy to particular symptoms, limitations, or treatments. The ALJ's analysis mirrors this approach.

These same considerations undermine plaintiff's contention that the ALJ should have found plaintiff's peripheral neuropathy per se to be a severe impairment.[8] Further, substantial evidence supports the merits of the ALJ's determination that plaintiff's neuropathy other than carpal tunnel syndrome/median neuropathy does not limit plaintiff sufficiently to be deemed severe. As discussed, the treatment records show that plaintiff's right-hand neuropathy was successfully treated with a conservative treatment regimen and the right-hand neuropathy was consistently reported by plaintiff to be worse than his left-hand neuropathy. The medical records show no complaints by plaintiff regarding the neuropathy in either his right or left arm and hand in or after March 2007.

In addition, no physician placed restrictions on plaintiff's use of his arms and hands (excluding the splints for the carpal tunnel syndrome in his right hand) or found the state of plaintiff's arms and hands to be disabling. *See id.* 17. To the contrary, as discussed, plaintiff was found not to have limitations on range of motion or manipulative ability. While plaintiff testified that the limitations on his hands were disabling, the ALJ lawfully found this testimony to be less than fully credible.[9] *Id.* 16-17. In making this determination, the ALJ relied in part on the range of

_____

[8] This same analysis would apply to a contention that plaintiff's polyneuropathy should have been found to be a severe impairment.

[9] In making his credibility assessment, the ALJ first determined that plaintiff's medically documented impairments could cause plaintiff's alleged symptoms and then cited specific reasons grounded in the evidence for finding that plaintiff's statements regarding the symptoms were less than fully credible. Tr. 16, 17. The ALJ therefore acted

10

activities of daily living which plaintiff told consulting physician Dr. Daskalakis he could perform during her examination of him in May 2006. *Id.* 17, 168. At times, plaintiff's testimony was self-discrediting on its face: he testified that he experiences numbness in his left hand only twice a day and for no more than a minute each time. *Id.* 45; *see also id.* 40, 45, 46, 47, 49-50 (plaintiff's hearing testimony regarding activities of daily living). Plaintiff's challenge to the ALJ's severity determination regarding plaintiff's neuropathy is accordingly meritless.

### 2. Pickwickian Syndrome

Plaintiff also contends that the ALJ omitted from his analysis consideration of plaintiff's Pickwickian syndrome, a sleep-related disorder. Plaintiff further argues that the ALJ should have found the Pickwickian syndrome to be a severe impairment. As with plaintiff's contentions regarding his neuropathy, the court disagrees.

The medical records show that plaintiff has had a sleep disorder of extended duration. The first mention of any sleep-related problem appears to be in the notes of a March 2006 visit with Dr. Okoye in which plaintiff complained of sleeping more in the past two years than before. *Id.* 186. Dr. Okoye made no sleep disorder diagnosis. However, in a visit the next month, Dr. Okoye found plaintiff to have possible obstructive sleep apnea, notwithstanding the absence of further sleep-related complaints by plaintiff. *Id.* Sleep apnea is the recurrent cessation of breathing during sleep and is "associated especially with excessive daytime sleepiness." *See* "sleep apnea," *MedlinePlus Dictionary.*

---

in accordance with applicable law. *Craig*, 76 F.3d at 594-95 (discussing 20 C.F.R. §§ 404.1529(c), 416.929(c) (evaluation of symptoms)); *Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006) (quoting Soc. Sec. R. 96-7p, 1996 WL 374186, at *2 (2 July 1996)). Although plaintiff alleges that the ALJ ignored peripheral neuropathy in his right hand in making the credibility determination, the court disagrees for the reasons discussed above. (*See* Plf.'s Mem. at 5)

In his May 2006 visit with consulting physician Dr. Daskalakis, plaintiff complained of having daytime sleepiness for at least a year. *Id.* 168. Like Dr. Okoye, Dr. Daskalakis found plaintiff to be at risk for sleep apnea. *Id.* 171. At his next medical visit, on 2 June 2006 with Dr. Okoye, plaintiff again complained of daytime sleepiness and reported that his mother, with whom he lives, told him he snored. *Id.* 181. Dr. Okoye referred plaintiff to a sleep study, which found him to have severe obstructive sleep apnea. *Id.* 174.

Plaintiff was prescribed CPAP therapy,[10] and it was shown to be effective in a follow-up sleep study in August 2006. *Id.* 175-76. In his next visit with Dr. Okoye, in September 2006, plaintiff reported that he could not afford a CPAP machine and was having trouble sleeping. *Id.* 177.

The medical records are then silent regarding plaintiff's sleep disorder for over a year, until 19 November 2007. *See id.* 203. It was not until then that a diagnosis of Pickwickian syndrome was made. *Id.* Pickwickian syndrome can be defined as obesity accompanied by somnolence as well as lethargy, hypoventilation (*i.e.*, deficient ventilation of the lungs), and related conditions.[11] *See* "Pickwickian syndrome," *MedlinePlus Dictionary.*

Contrary to plaintiff's contention, it is apparent from the ALJ's decision that he was aware of plaintiff's daytime sleepiness and the handling of it in the medical records. In his decision, the ALJ accurately reviews the principal medical records dealing with plaintiff's daytime sleepiness and

---

[10] CPAP therapy involves use of a machine to maintain continuous positive air pressure in a patient's airway and thereby prevent the obstruction of the airway associated with obstructive sleep apnea. *See* "Nasal CPAP," *MedlinePlus Encyclopedia*, www.nlm.nih.gov/medlineplus/ency/article/001916.htm (U.S. Nat'l Med. Library & Nat'l Inst. of Health).

[11] The syndrome derives its name from the Charles Dickens novel *The Posthumous Papers of the Pickwick Club*. The novel purportedly contains the first description of the syndrome found in literature. The description relates to the character Joe, who is depicted as obese and somnolent. *See* "Pickwickian syndrome," *MedlinePlus Dictionary.*

12

diagnosis of sleep apnea, along with the later diagnosis of Pickwickian syndrome. Tr. 15-16. In addition, of course, the ALJ expressly found plaintiff's sleep apnea to be a severe impairment. *Id.* 13 ¶ 3. He also includes in his RFC for plaintiff a prohibition against operation of a motor vehicle. *Id.* 14. This restriction is clearly based on plaintiff's daytime sleepiness. The medical records speak of the possible need for plaintiff to avoid driving due to daytime sleepiness (*id.* 172) and plaintiff testified at the hearing about his not driving long distances for that reason (*id.* 48). The ALJ questioned plaintiff specifically about his daytime sleepiness at the hearing. *Id.* 30-31.

The ALJ was justified in not treating sleep apnea and Pickwickian syndrome as distinct impairments in his severity determination or otherwise. As the foregoing definitions of the two conditions indicate, the symptomology of both focuses on daytime sleepiness. That is certainly the predominant sleep-related symptom manifested by plaintiff according to the record.

Moreover, for virtually the entire period of plaintiff's claimed disability, his sleeping disorder was diagnosed as sleep apnea. The diagnosis of Pickwickian syndrome came only one and a half months before the end of the treatment period covered by the medical records and two months before the hearing.

In addition, the diagnosis was not based on any new symptomology. *See id.* 203. Although plaintiff complained of difficulty breathing at the November 2007 visit when the diagnosis was made, he had complained of shortness of breath just three months earlier in an August 2007 visit to Dr. Okoye. *Id.* 203, 216. Nor was any additional or different treatment prescribed for the Pickwickian syndrome, just the stock advice plaintiff had been receiving from the start to lose weight. *Id.* Similarly, no restrictions were placed on plaintiff due to the Pickwickian syndrome. *Id.*

13

What did change was the identity of the diagnosing physician, who necessarily brought to bear his own preferences regarding the characterization of plaintiff's condition.

In short, the record does not establish Pickwickian syndrome as sufficiently distinguishable from plaintiff's sleep apnea or of sufficient duration to have compelled the ALJ to treat it as a separate impairment for purposes of his severity determination or the other portions of his analysis. Rather, the court believes that the ALJ's handling of plaintiff's sleep-related disorder was legally adequate. For this and the other reasons stated, plaintiff's contention that the ALJ did not consider all of plaintiff's impairments is meritless.

### D.    Inclusion of All Limitations in the RFC Determination

Plaintiff argues that the ALJ's RFC determination is erroneous because it did not impose greater limitations on plaintiff's use of his right hand and did not impose any limitations on plaintiff's use of his left hand. The court disagrees and finds that substantial evidence supports the RFC determination.

Among the supporting evidence is that previously discussed. This includes the absence of medical findings that plaintiff has limitations in his range of motion and manipulative ability, the absence of any restrictions placed by plaintiff's physicians on his use of his hands, and the positive response to the conservative treatment administered for plaintiff's carpal tunnel syndrome. In addition, as also discussed, the ALJ properly found plaintiff's claims of disabling symptoms not to be fully credible.

Substantial evidence also supports the specific determination in the ALJ's RFC assessment that plaintiff is limited to only frequent right-hand tasks requiring fingering and handling. Such evidence includes plaintiff's history of carpal tunnel syndrome in his right hand, the nerve

14

conduction studies underlying the diagnosis of carpal tunnel syndrome, the fact that plaintiff is right handed (as he himself testified, *id.* 29, 49), and plaintiff's testimony and medical records indicating that the symptomology in his right hand is significantly worse than that in his left hand (*see, e.g., id.* 43-45). The court accordingly rejects plaintiff's challenge to the ALJ's RFC determination.

### E.    Finding of Past Relevant Work

To qualify under the Regulations as past relevant work, work must meet three basic requirements: (1) it must have been done within the last 15 years; (2) it must have lasted long enough to enable the worker to learn to do it ("duration requirement"); and (3) it must constitute substantial gainful activity. 20 C.F.R. §§ 404.1565(a), 416.965(a). Substantial gainful activity is work activity that involves doing significant physical or mental activities, and is done for pay or profit. 20 C.F.R. §§ 404.1572, 416.972. If earnings from work activity reach a certain level, the earnings are deemed to show that the worker engaged in substantial work activity. 20 C.F.R. §§ 404.1574(b)(2), 416.974(b)(2).

Plaintiff contends that his work as an industrial cleaner at Impulse did not meet the duration requirement or, due to insufficient earnings, the substantial gainful activity requirement. He argues that the ALJ therefore erred in finding that his work at Impulse was past relevant work. Plaintiff's contentions are meritless.

At the hearing, the ALJ established through questioning of plaintiff that he had worked at Impulse during the summers of 1998 and 1999. Tr. 33. The dates of plaintiff's employment with Impulse were previously unclear because he had reported different periods on various forms: 1997 to 2002 (*id.* 133), 1999 to 2002 (*id.* 157), and the summer of 1998 or 1999 (*id.* 158).

15

The approximately six-month period comprising the summers of 1998 and 1999 was sufficiently long for plaintiff to "have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation" in fulfillment of the duration requirement. Soc. Sec. R. 82-62, 1982 WL 31386, *2 (1982). This period is adequate because of the relative simplicity of the industrial cleaner job. *See id.* (length of time to learn job "depends on the nature and complexity of the work"). Under the *DOT*, the job of industrial cleaner has a specific vocational preparation ("SVP") level of 2, meaning that a typical worker would need only training beyond a short demonstration up to a month to learn the job. *DOT* #381.687-018 & app. C (definition of SVP level). The fact that plaintiff was re-hired in the summer of 1999 substantiates that he had learned the job. Plaintiff has offered no evidence indicating that his work at Impulse did not meet the durational requirement, or otherwise failed to constitute past relevant work, although he bore the burden of proof on this issue. *See Gray v. Heckler*, 760 F.2d 369, 372 (1st Cir. 1985). The court accordingly rejects plaintiff's challenge to the ALJ's past relevant work finding based on the duration requirement.

Regarding plaintiff's earnings at Impulse, the certified earnings record for plaintiff show that he earned $6,646.86 in 1998 and $9,593.82 in 1999. Tr. 111. None of the forms plaintiff completed showed him to have any employer other than Impulse in 1998 and 1999. The ALJ could therefore lawfully conclude that these earnings in 1998 and 1999 represent the earnings plaintiff had at Impulse. As such, they equate to over $2,000.00 per month worked in 1998 and over $3,000.00 per month worked in 1999. These earnings far exceed the presumptive monthly minimums of $500.00 and $700.00 for 1998 and 1999, respectively, to establish plaintiff's work at Impulse as substantial gainful activity. *See* 20 C.F.R. §§ 404.1574(b)(2), 416.974(b)(2); Soc. Sec. Admin. website, SGA

16

amounts, www.ssa.gov/OACT/COLA/sga.html. The court concludes that substantial evidence in the record supports the ALJ's determination that plaintiff's work at Impulse was past relevant work.

The court has considered the other arguments advanced by plaintiff challenging the ALJ's decision. As with those challenges discussed above, the court finds them to be without merit.[12]

## III. CONCLUSION

For the foregoing reasons, the court concludes that the ALJ applied the proper legal standards and that his decision is supported by substantial evidence. IT IS THEREFORE RECOMMENDED that the Commissioner's motion for judgment on the pleadings be ALLOWED, plaintiff's motion for judgment on the pleadings be DENIED, and the final decision of the Commissioner be AFFIRMED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten business days, or such other period as the presiding District Judge directs, to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

---

[12] For example, plaintiff argues that if his work at Impulse is not deemed past relevant work or he is deemed unable to perform that work, Medical-Vocational Guidelines Rule 201.02 would require a finding of disability. (Plf.'s Mem. at 7). Aside from the fact that the alternative contingencies posited are contrary to the lawful determinations of the ALJ, plaintiff's contention overlooks the fact that the Guidelines are not conclusive when, as here, a nonexertional impairment such as loss of dexterity is present. *See Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir.1983); *see also* 20 C.F.R. §§ 404.1569, 416.969.

This, the 17th day of June, 2009.

James E. Gates
United States Magistrate Judge

18

**APPENDIX OF INTERNET MATERIALS CITED**



# Medical Dictionary

One entry found for **electromyograph**.


Main Entry: **elec·tro·myo·graph**
Pronunciation: -ˌgraf
Function: *noun*
: an instrument that converts the electrical activity associated with functioning skeletal muscle into a visual record or into sound and has been used to diagnose neuromuscular disorders and in biofeedback training
- **elec·tro·myo·graph·ic** /-ˌmī-ə-ˈgraf-ik/ *adjective*
- **elec·tro·myo·graph·i·cal·ly** /-i-k(ə-)lē/ *adverb*
- **elec·tro·my·og·ra·phy** /-mī-ˈäg-rə-fē/ *noun, plural* -phies


Search here for another word:

**❯ SEARCH** [_____]  Look it up

Merriam-Webster

---

## Pronunciation Key

| | | |
|---|---|---|
| \ ə \ as **a** in abut | \ g \ as **g** in go | \ r \ as **r** in red |
| \ ˈə ˌə \ as **u** in abut | \ h \ as **h** in hat | \ s \ as **s** in less> |
| \ ᵊ \ as **e** in kitten | \ i \ as **i** in hit | \ sh \ as **sh** in shy |
| \ ər \ as **ur/er** in further | \ ī \ as **i** in ice | \ t \ as **t** in tie |
| \ a \ as **a** in ash | \ j \ as **j** in job | \ th \ as **th** in thin |
| \ ā \ as **a** in ace | \ k \ as **k** in kin | \ t͟h \ as **th** in the |
| \ ä \ as **o** in mop | \ k̲ \ as **ch** in ich dien | \ ü \ as **oo** in loot |
| \ au̇ \ as **ou** in out | \ l \ as **l** in lily | \ u̇ \ as **oo** in foot |
| \ b \ as in baby | \ m \ as **m** in murmur | \ v \ as **v** in vivid |
| \ ch \ as **ch** in chin | \ n \ as **n** in own | \ w \ as **w** in away |
| \ d \ as **d** in did | \ ŋ \ as **ng** in sing | \ y \ as **y** in yet |
| \ e \ as **e** in bet | \ ō \ as **o** in go | \ yü \ as **you** in youth |
| \ ˈē ˌē \ as **ea** in easy | \ ȯ \ as **aw** in law | \ yu̇ \ as **u** in curable |
| \ ē \ as **y** in easy | \ ȯi \ as **oy** in boy | \ z \ as **z** in zone |
| \ f \ as **f** in fifty | \ p \ as **p** in pepper | \ zh \ as **si** in vision |

© 2009 by Merriam-Webster, Incorporated

**MedlinePlus®**
Trusted Health Information for You

A service of the U.S. NATIONAL LIBRARY OF MEDICINE
and the NATIONAL INSTITUTES OF HEALTH

| Print this page | Close this window |

# Medical Encyclopedia: Nasal CPAP

URL of this page: http://www.nlm.nih.gov/medlineplus/ency/article/001916.htm

## Alternative names

Continuous positive airway pressure; CPAP; Bilevel positive airway pressure; BiPAP

## Definition

CPAP stands for "continuous positive airway pressure." CPAP is a treatment that delivers slightly pressurized air during the breathing cycle. This makes breathing easier for persons with obstructive sleep apnea and other respiratory problems.

## Information

Nasal CPAP is given through a mask that is placed and secured over the person's nose or nose and mouth. Slight positive pressure is used to increase the amount of air breathed in without increasing the work of breathing.

A similar machine, called BiPAP (for bilevel positive airway pressure) is used as an alternative to CPAP.

These devices are useful for children with collapsible airways, small lung volumes, or muscle weakness that make it difficult to breathe.

CPAP or BiPAP may also be used for those who have acute respiratory failure, central sleep apnea, heart failure, or COPD.

It can take some time to become used to a CPAP device. However, most people who receive help from a respiratory therapist or doctor are able to use and benefit from the machine.

## References

Basner RC. Continuous positive airway pressure for obstructive sleep apnea. *N Engl J Med*. 2007 Apr 26;356(17):1751-8.

Weaver TE, Maislin G, Dinges DF, Bloxham T, George CF, Greenberg H, et al. Relationship between hours of CPAP use and achieving normal levels of sleepiness and daily functioning. *Sleep*. 2007 Jun 1;30(6):711-9.

## Update Date: 9/12/2008

Updated by: Allen J. Blaivas, DO, Pulmonary, Critical Care, and Sleep Medicine, Department of Veteran Affairs, VA New Jersey Health Care System, East Orange , NJ. Review provided by VeriMed Healthcare Network. Also reviewed by David Zieve, MD, MHA, Medical Director, A.D.A.M., Inc.

✦A.D.A.M.

The information provided should not be used during any medical emergency or for the diagnosis or treatment of any medical condition. A licensed physician should be consulted for diagnosis and treatment of any and all medical conditions. Call 911 for all medical emergencies. Adam makes no representation or warranty regarding the accuracy, reliability, completeness, currentness, or timeliness of the content, text or graphics. Links to other sites are provided for information only -- they do not constitute endorsements of those other sites. Copyright 1997-2009, A.D.A.M., Inc. Any duplication or distribution of the information contained herein is strictly prohibited.



# Medical Dictionary

2 entries found for **neuropathy**. Select an entry and then click 'Go'.

 Go

Main Entry: **neu·rop·a·thy**
Pronunciation: n(y)u̇-ˈräp-ə-thē
Function: *noun*
Inflected Form(s): *plural* **-thies**
: an abnormal and usually degenerative state of the nervous system or nerves; *also* : a systemic condition (as muscular atrophy) that stems from a neuropathy

Search here for another word:

**SEARCH** _____ Look it up ⬤ Merriam-Webster.

---

## Pronunciation Key

| | | |
|---|---|---|
| \ ə \ as a in abut | \ g \ as g in go | \ r \ as r in red |
| \ ˈə ˌə \ as u in abut | \ h \ as h in hat | \ s \ as s in less> |
| \ ə \ as e in kitten | \ i \ as i in hit | \ sh \ as sh in shy |
| \ ər \ as ur/er in further | \ ī \ as i in ice | \ t \ as t in tie |
| \ a \ as a in ash | \ j \ as j in job | \ th \ as th in thin |
| \ ā \ as a in ace | \ k \ as k in kin | \ th \ as th in the |
| \ ä \ as o in mop | \ k̲ \ as ch in ich dien | \ ü \ as oo in loot |
| \ au̇ \ as ou in out | \ l \ as l in lily | \ u̇ \ as oo in foot |
| \ b \ as in baby | \ m \ as m in murmur | \ v \ as v in vivid |
| \ ch \ as ch in chin | \ n \ as n in own | \ w \ as w in away |
| \ d \ as d in did | \ ŋ \ as ng in sing | \ y \ as y in yet |
| \ e \ as e in bet | \ ō \ as o in go | \ yü \ as you in youth |
| \ ˈē ˌē \ as ea in easy | \ ȯ \ as aw in law | \ yu̇ \ as u in curable |
| \ ē \ as y in easy | \ ȯi \ as oy in boy | \ z \ as z in zone |
| \ f \ as f in fifty | \ p \ as p in pepper | \ zh \ as si in vision |

© 2009 by Merriam-Webster, Incorporated



## Medical Dictionary

2 entries found for **neuropathy**. Select an entry and then click 'Go'.

 Go

**Main Entry:** **peripheral neuropathy**
**Function:** *noun*
: a disease or degenerative state (as polyneuropathy) of the peripheral nerves in which motor, sensory, or vasomotor nerve fibers may be affected and which is marked by muscle weakness and atrophy, pain, and numbness

Search here for another word:

❯ SEARCH [ _____ ] Look it up        Merriam-Webster

---

### Pronunciation Key

| | | |
|---|---|---|
| \ ə \ as a in abut | \ g \ as g in go | \ r \ as r in red |
| \ ′ə ̩ə \ as u in abut | \ h \ as h in hat | \ s \ as s in less> |
| \ ə \ as e in kitten | \ i \ as i in hit | \ sh \ as sh in shy |
| \ ər \ as ur/er in further | \ ī \ as i in ice | \ t \ as t in tie |
| \ a \ as a in ash | \ j \ as j in job | \ th \ as th in thin |
| \ ā \ as a in ace | \ k \ as k in kin | \ th̲ \ as th in the |
| \ ä \ as o in mop | \ k̲ \ as ch in ich dien | \ ü \ as oo in loot |
| \ au̇ \ as ou in out | \ l \ as l in lily | \ u̇ \ as oo in foot |
| \ b \ as in baby | \ m \ as m in murmur | \ v \ as v in vivid |
| \ ch \ as ch in chin | \ n \ as n in own | \ w \ as w in away |
| \ d \ as d in did | \ ŋ \ as ng in sing | \ y \ as y in yet |
| \ e \ as e in bet | \ ō \ as o in go | \ yü \ as you in youth |
| \ ′ē ̩ē \ as ea in easy | \ ȯ \ as aw in law | \ yu̇ \ as u in curable |
| \ ē \ as y in easy | \ ȯi \ as oy in boy | \ z \ as z in zone |
| \ f \ as f in fifty | \ p \ as p in pepper | \ zh \ as si in vision |

© 2009 by Merriam-Webster, Incorporated



# Medical Dictionary

One entry found for **peripheral nervous system**.

Main Entry: **peripheral nervous system**
Function: *noun*
: the part of the nervous system that is outside the central nervous system and comprises the cranial nerves excepting the optic nerve, the spinal nerves, and the autonomic nervous system

Search here for another word:

SEARCH [                    ]  __Look it up__                    Merriam-Webster

---

## Pronunciation Key

| | | |
|---|---|---|
| \ ə \ as a in abut | \ g \ as g in go | \ r \ as r in red |
| \ ˈə ɪə \ as u in abut | \ h \ as h in hat | \ s \ as s in less> |
| \ ə \ as e in kitten | \ i \ as i in hit | \ sh \ as sh in shy |
| \ ər \ as ur/er in further | \ ī \ as i in ice | \ t \ as t in tie |
| \ a \ as a in ash | \ j \ as j in job | \ th \ as th in thin |
| \ ā \ as a in ace | \ k \ as k in kin | \ th \ as th in the |
| \ ä \ as o in mop | \ k̲ \ as ch in ich dien | \ ü \ as oo in loot |
| \ aú \ as ou in out | \ l \ as l in lily | \ ú \ as oo in foot |
| \ b \ as in baby | \ m \ as m in murmur | \ v \ as v in vivid |
| \ ch \ as ch in chin | \ n \ as n in own | \ w \ as w in away |
| \ d \ as d in did | \ ŋ \ as ng in sing | \ y \ as y in yet |
| \ e \ as e in bet | \ ō \ as o in go | \ yü \ as you in youth |
| \ ˈē ɪē \ as ea in easy | \ ȯ \ as aw in law | \ yú \ as u in curable |
| \ ē \ as y in easy | \ ȯi \ as oy in boy | \ z \ as z in zone |
| \ f \ as f in fifty | \ p \ as p in pepper | \ zh \ as si in vision |

© 2009 by Merriam-Webster, Incorporated



# Medical Dictionary

One entry found for **Pickwickian syndrome**.

**Main Entry:** **Pick·wick·ian syndrome**
**Pronunciation:** (ˈ)pik-ˈwik-ē-ən-
**Function:** *noun*
: obesity accompanied by somnolence and lethargy, hypoventilation, hypoxia, and secondary polycythemia
**Pick·wick** /ˈpik-ˌwik/ , **Samuel** literary character. Pickwick is the title character in the novel *The Posthumous Papers of the Pickwick Club* (1836-37) by Charles Dickens. In the novel one of the characters, Joe, is described as a "fat and red-faced boy in a state of somnolence." The term *Pickwickian syndrome* was first used by C. S. Burwell in an article on the syndrome in 1956. The name was chosen because Dickens's description was the first description of the syndrome found in literature.

Search here for another word:

● SEARCH   [                    ]   Look it up   Merriam-Webster

---

## Pronunciation Key

| | | |
|---|---|---|
| \ ə \ as a in abut | \ g \ as g in go | \ r \ as r in red |
| \ ˈə ˌə \ as u in abut | \ h \ as h in hat | \ s \ as s in less> |
| \ ᵊ \ as e in kitten | \ i \ as i in hit | \ sh \ as sh in shy |
| \ ər \ as ur/er in further | \ ī \ as i in ice | \ t \ as t in tie |
| \ a \ as a in ash | \ j \ as j in job | \ th \ as th in thin |
| \ ā \ as a in ace | \ k \ as k in kin | \ th \ as th in the |
| \ ä \ as o in mop | \ ḵ \ as ch in ich dien | \ ü \ as oo in loot |
| \ aú \ as ou in out | \ l \ as l in lily | \ ú \ as oo in foot |
| \ b \ as in baby | \ m \ as m in murmur | \ v \ as v in vivid |
| \ ch \ as ch in chin | \ n \ as n in own | \ w \ as w in away |
| \ d \ as d in did | \ ŋ \ as ng in sing | \ y \ as y in yet |
| \ e \ as e in bet | \ ō \ as o in go | \ yü \ as you in youth |
| \ ˈē ˌē \ as ea in easy | \ ȯ \ as aw in law | \ yú \ as u in curable |
| \ ē \ as y in easy | \ ȯi \ as oy in boy | \ z \ as z in zone |
| \ f \ as f in fifty | \ p \ as p in pepper | \ zh \ as si in vision |

© 2009 by Merriam-Webster, Incorporated



## Medical Dictionary

One entry found for **sleep apnea**.

Main Entry: **sleep apnea**
Function: *noun*
: brief periods of recurrent cessation of breathing during sleep that is caused especially by obstruction of the airway or a disturbance in the brain's respiratory center and is associated especially with excessive daytime sleepiness

Search here for another word:

❯ SEARCH  [                    ]  Look it up

### Pronunciation Key

| | | |
|---|---|---|
| \ ə \ as a in abut | \ g \ as g in go | \ r \ as r in red |
| \ ˈə ˌə \ as u in abut | \ h \ as h in hat | \ s \ as s in less> |
| \ ᵊ \ as e in kitten | \ i \ as i in hit | \ sh \ as sh in shy |
| \ ər \ as ur/er in further | \ ī \ as i in ice | \ t \ as t in tie |
| \ a \ as a in ash | \ j \ as j in job | \ th \ as th in thin |
| \ ā \ as a in ace | \ k \ as k in kin | \ th \ as th in the |
| \ ä \ as o in mop | \ k̲ \ as ch in ich dien | \ ü \ as oo in loot |
| \ aủ \ as ou in out | \ l \ as l in lily | \ ủ \ as oo in foot |
| \ b \ as in baby | \ m \ as m in murmur | \ v \ as v in vivid |
| \ ch \ as ch in chin | \ n \ as n in own | \ w \ as w in away |
| \ d \ as d in did | \ ŋ \ as ng in sing | \ y \ as y in yet |
| \ e \ as e in bet | \ ō \ as o in go | \ yü \ as you in youth |
| \ ˈē ˌē \ as ea in easy | \ ȯ \ as aw in law | \ yủ \ as u in curable |
| \ ē \ as y in easy | \ ȯi \ as oy in boy | \ z \ as z in zone |
| \ f \ as f in fifty | \ p \ as p in pepper | \ zh \ as si in vision |

© 2009 by Merriam-Webster, Incorporated

Social Security Online
Office of the Chief Actuary

# Automatic Increases

 **Substantial Gainful Activity**

Automatic Increases

Determinations:
  SGA for blind
  SGA for non-blind
disabled

Wage-indexed
amounts

To be eligible for disability benefits, a person must be unable to engage in substantial gainful activity (SGA). A person who is earning more than a certain monthly amount (net of impairment-related work expenses) is ordinarily considered to be engaging in SGA. The amount of monthly earnings considered as SGA depends on the nature of a person's disability. The Social Security Act specifies a higher SGA amount for statutorily blind individuals; Federal regulations specify a lower SGA amount for non-blind individuals. Both SGA amounts increase with increases in the national average wage index.

**Amounts for 2009**
The monthly SGA amount for statutorily blind individuals for 2009 is $1,640. For non-blind individuals, the monthly SGA amount for 2009 is $980. SGA for the blind does *not* apply to Supplemental Security Income (SSI) benefits, while SGA for the non-blind disabled applies to Social Security and SSI benefits. See historical series of SGA amounts below.

**Trial work period**
After a person becomes eligible for disability benefits, the person may attempt to return to the work force. As an incentive, we provide a *trial work period* in which a beneficiary may have earnings and still collect benefits.

### Monthly substantial gainful activity amounts by disability type

| Year | Non-blind | Blind | Year | Non-blind | Blind | Year | Non-blind | Blind |
|------|-----------|-------|------|-----------|-------|------|-----------|-------|
| 1975 | $200 | $200 | 1990 | $500 | $780 | 2005 | $830 | $1,380 |
| 1976 | 230 | 230 | 1991 | 500 | 810 | 2006 | 860 | 1,450 |
| 1977 | 240 | 240 | 1992 | 500 | 850 | 2007 | 900 | 1,500 |
| 1978 | 260 | 333 | 1993 | 500 | 880 | 2008 | 940 | 1,570 |
| 1979 | 280 | 375 | 1994 | 500 | 930 | 2009 | 980 | 1,640 |
| 1980 | 300 | 417 | 1995 | 500 | 940 | | | |
| 1981 | 300 | 458 | 1996 | 500 | 960 | | | |
| 1982 | 300 | 500 | 1997 | 500 | 1,000 | | | |
| 1983 | 300 | 550 | 1998 | 500 | 1,050 | | | |
| 1984 | 300 | 580 | 1999 | 700 [a] | 1,110 | | | |
| 1985 | 300 | 610 | 2000 | 700 | 1,170 | | | |
| 1986 | 300 | 650 | 2001 | 740 | 1,240 | | | |
| 1987 | 300 | 680 | 2002 | 780 | 1,300 | | | |
| 1988 | 300 | 700 | 2003 | 800 | 1,330 | | | |
| 1989 | 300 | 740 | 2004 | 810 | 1,350 | | | |
| | | | [a] $500 amount applied in the first half of 1999. | | | | | |